# National Union Fire Insurance Co. *v.* Mellon National Bank, Appellant.

*Banks and banking—Bills of exchange—Forged drafts—Acceptance—Purchase of claim—Endorser's signature—Negotiable Instruments Act of May 16, 1901, P. L. 194.*

1. The acceptance of a draft by the drawee does not admit the genuineness of the endorser's signature.

2. Where the drawee knows the payee is a real person and intends that he should be paid, and the payee's endorsement is forged, the bank that pays on the forged endorsement is liable for the loss.

3. In such case the payee is not a fictitious or nonexisting person within the meaning of section 62 of the Negotiable Instruments Act of May 16, 1901, P. L. 194.

4. Where drafts are drawn to policyholders of an insurance company for fire losses, where in fact no fire occurred and the payee's endorsements are forged, and the drafts show on the face that they are payable only on acceptance by the insurance company, an acceptance by the insurance company does not relieve the bank that has paid the drafts on the forged endorsements.

5. The mere fact that such drafts had printed on their backs instructions by the drawer as to how the drafts were to be endorsed, does not relieve the bank.

6. Where it appears that the drafts were addressed to the insurance company, signed by the general agents of the company in a distant city, and stated that they were payable at a bank mentioned on acceptance by the insurance company, such drafts, although not in the ordinary form, become valid negotiable instruments after their acceptance.

7. Nor is it material that they were not addressed to the bank; nor that the party to do the paying was not the party whose acceptance was required.

8. If the drafts were prepared by an employee of the general agents in pursuance of a scheme to defraud the insurance company, and the payees' names were forged by him, the knowledge of such employee cannot be imputed to his principal, if it appears that he was not employed thereafter to compare the monthly bank statements with the cancelled checks nor in any other service that would have disclosed to an honest employee the forgeries in question.

9. No agent who is acting in his own antagonistic interest, or has committed a fraud by which his principal is affected, can be presumed to have disclosed such fraud.

10. After the payment of such forged drafts, there is nothing to debar the general agents by whom the drafts were issued, from settling a suit brought against them by the insurance company, and from buying an interest in the company's claim against the bank, and suing the bank thereon.

11. The paying bank may recover from other banks through which the draft passed, where they guaranteed it.

Argued October 17, 1922. Appeal, No. 97, Oct. T., 1922, by defendant, from judgment of C. P. Allegheny Co., Jan. T., 1918, No. 778, on verdict for plaintiff, in case of National Union Fire Insurance Company, to use of William M. Alberti v. Mellon National Bank. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, SADLER and SCHAFFER, JJ. Affirmed.

Assumpsit to recover money paid out on forged drafts. Before EVANS, J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiff for $6,430.21. Defendant appealed.

*Errors assigned,* inter alia, were refusal of defendant's motion for judgment n. o. v., quoting record, and various instructions appearing by the opinion of the Supreme Court, quoting record.

*John Murray Redden,* with him *Ralph H. Frank* and *Reed, Smith, Shaw & Beal,* for appellant.—When the drafts were presented to defendant for payment they were payable to bearer and defendant had no concern with the question of the genuineness or authenticity of the endorsements: Land T. & T. Co. v. Bank, 196 Pa. 230; Marcus v. Bank, 57 Pa. Superior Ct. 345; Snyder v. Bank, 221 Pa. 599.

The circumstances surrounding the issuance of these drafts, their endorsement, acceptance and presentment for payment were such as to relieve the defendant of any responsibility in relation to the genuineness or authenticity of the endorsements: W. U. Tel. Co. v. Bank, 17 Colo. App. 229.

A principal is chargeable with all the knowledge which an agent secured while acting within the scope of his employment: Gunster v. Heat & Power Co., 181 Pa. 327; Lilly v. Bank, 178 Fed. 53; Myers v. Bank, 193 Pa. 1.

The court erred in taking from the jury the question of the negligence of James & Co., plaintiff's general agent: Texas & Pac. Ry. v. Behymer, 189 U. S. 468.

*J. Merrill Wright,* of *Wright, Chalfant & McCandless,* with him *Hartwell Cabell* and *Robert A. Rundle,* for appellee.—The drafts in suit were not payable to bearer: Penna. M. L. Ins. Co. v. Bank, 70 Pa. Superior Ct. 34.

Defendant was not relieved of responsibility in relation to the genuineness or authenticity of the endorsements.

The purchase by James & Co. of one-half the claim from National Union Fire Insurance Co. and the subsequent assignment to the use-plaintiff would not prevent recovery.

OPINION BY MR. JUSTICE SCHAFFER, January 3, 1923:

This action was assumpsit brought by plaintiff fire insurance company, a depositor in defendant bank, to recover the amount paid out by the latter and charged to the former's account on drafts on which the payees' endorsements were forged. The appeal is by defendant from a judgment on the verdict in plaintiff's favor.

Plaintiff insurance company is located in the City of Pittsburgh, where appellant's bank is also located.

The circumstances giving rise to the suit are these: James & Company were general agents for plaintiff in the City of New York authorized to place insurance, adjust losses and draw drafts on it for payment. One Carty was employed by them as loss clerk, having charge of the adjustment of losses. He had authority to adjust losses of the character for which the drafts in question were drawn. He presented the proofs of loss to James & Company of fires which had not taken place on properties covered by policies in plaintiff company issued by them, received the drafts in payment for the supposed losses drawn to the policyholders, forged the names of the payees on the drafts, deposited them in banks which forwarded them to Pittsburgh for acceptance by plaintiff, the latter accepted them without investigation as to the genuineness of the payees' signatures, and they were paid by defendant bank on which they were drawn and charged by it to plaintiff's account. After discovery of the forgeries, suit was brought to recover from defendant the amount of the drafts. At the trial, the only question submitted to the jury was whether the endorsements of the payee had been forged; the verdict determined they had been.

Defendant contends that binding instructions should have been given for it and there should now be judgment in its favor non obstante veredicto (1) because when presented to defendant for payment the instruments in legal effect were payable to bearer; (2) because the circumstances surrounding the utterance, endorsement and acceptance of the instruments were such as to authorize the defendant to pay them without regard to the authenticity of the endorsements; (3) because plaintiff is chargeable with knowledge of the frauds which took place approximately five years before it gave any notice thereof to appellant; (4) because the circumstances of a settlement made by plaintiff with James & Company against whom it had brought suit to recover the amount of the drafts, were such as to discharge defendant from liability; (5) because the drafts were not negotiable instruments.

The acceptance of a draft does not admit the genuineness of the endorser's signature. "Moneys paid upon checks and drafts which have been forgeries either in the body of the instrument or the endorsements, or in any respect, except the name of the drawer, have uniformly been held recoverable as for money paid by mistake": Whitley on Bills, Notes & Checks (1917) p. 188. "The drawee of a bill of exchange is conclusively presumed to know the signature of the drawer, and if he accepts or pays, in the usual course of business, a bill whereon the signature of the drawer is a forgery, he will be estopped after to deny the genuineness of such signature. But the drawee is not chargeable with knowledge of any other signature on the bill of exchange, and by accepting or paying the bill does not admit the genuineness of any endorsement on it. The acceptor is not deemed to admit the signature of the payee": 3 Ruling Case Law, p. 1145. "Acceptance does not admit the genuineness of the signature of the payee or of any subsequent endorser, but the signatures of all endorsers necessary to transfer title to the holder must be proved in order to obtain judg-

ment against the acceptor": 8 Corpus Juris 332. Section 62 of the Negotiable Instruments Act of May 16, 1901, P. L. 194, 3 Stewart's Purdon 3281,—providing "The acceptor, by accepting the instrument, engages that he will pay it according to the tenor of its acceptance and admits: (1) the existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and (2) the existence of the payee and his then capacity to endorse,"—is not in conflict with the established rule. The plain language of the act forbids such construction.

We have, then, the situation that under the established rule the acceptance of the drafts by plaintiff did not relieve defendant bank from responsibility to see before payment that the signatures of the endorsers were genuine. How does it seek to escape this duty? First, by the argument that the drafts were payable to a fictitious person and therefore under the Negotiable Instruments Act to bearer. "The instrument is payable to bearer . . . . . . when it is payable to the order of a fictitious or nonexisting person and such fact was known to the person making it so payable": Negotiable Instruments Act, section 9. It might be sufficient to answer this contention with the bald statement that the drafts were not drawn to the order of fictitious or nonexisting persons; they were drawn to real persons for whom the drawer of the drafts, James & Company, had negotiated insurance. It was the losses the drafts undertook to pay not the payees therein which were fictitious. In addition to this, the fictitious or nonexisting persons must have been known to the drawer of the drafts to be such, before the result contended for could operate on the instruments, but the drawer knew no such thing, but just the opposite, that each of the payees was a real, existing person named as the insured in a policy of insurance issued by the drawer of the draft.

As sustaining its position, appellant cites Land Title & Trust Co. v. Northwestern National Bank, 196 Pa.

230; Snyder v. Corn Exchange National Bank, 221 Pa. 599, and Marcus v. People's National Bank, 57 Pa. Superior Ct. 345. In the Land Title Case, one Ashley, representing himself to be Bissey, an owner of real estate and having Bissey's deed in his possession, made application to the plaintiff for a mortgage loan, fraudulently executed a mortgage on the property in Bissey's name and received from the plaintiff a check for the amount of it drawn to Bissey's order and forged his name on it. No one in that case ever pretended that Bissey, the real owner of the property, was to receive the check. Here the intent was that the drafts should be paid to the named payees. In Snyder v. Corn Exchange National Bank, 221 Pa. 599; 606, the facts were that Niemann, payee in the checks, "was not a real, bona fide payee, but was in legal contemplation a fictitious person, such fact having been well known to Greenfield [drawer of the checks under a power of attorney] at the time he drew the checks;......and it never was intended by Greenfield that he should receive them or their proceeds." In the case at bar, it was intended by James & Company, drawer of the drafts, that the payees therein should receive them and the money they called for. In the last-cited case it was further said: "The intent of the drawer of the check, in inserting the name of a payee, is the sole test of whether the payee is a fictitious person." In Marcus v. People's National Bank, 57 Pa. Superior Ct. 345, the fraud consisted of one Moskovitz, an attorney-at-law, whom Marcus, the plaintiff, had befriended, inducing him, Marcus, to draw checks for alleged mortgage loans to supposed clients of Moskovitz. The latter procured the checks to be endorsed and they were paid by the bank on which drawn. In the action by Marcus against the bank, it was said by Judge HENDERSON, speaking for the Superior Court: "It is not reasonable to charge the bank with the consequences of the payment of a forged endorsement when the plaintiff put in circulation checks *which were not susceptible of a*

*genuine endorsement.* The case was one for the application of the rule that as between two innocent parties he who by his acting makes loss possible, must bear it."

In the instant case, the facts are that the drawer of the drafts, intended that they should be paid to the policy-holders, who were real and not fictitious or nonexisting persons. Where the drawer knows the payee is a real person and intends that he should be paid, and the payee's endorsement is forged, the bank that pays on the forged endorsement is liable for the loss.

The case of Pennsylvania Mutual Life Ins. Co. v. North Penn Bank, 70 Pa. Superior Ct. 34, supports the above view. In that case, a check was drawn by an insurance company on proofs of death provided by its agent to the order of one Fannie Goetz, the beneficiary, upon the life of Leo M. Goetz. A woman accompanied by the agent presented the check to the bank on which it was drawn, and upon her endorsement of the check, and identification by the agent, the money was paid to her. It was subsequently discovered that Goetz was still alive, that the proofs of death were fraudulent, and that the endorsement was fraudulent. The bank was held liable for the payment. "Fannie Goetz" it was said "was not a fictitious person, she was a person to whom this plaintiff had contracted to pay money upon the happening of a certain contingency." The company properly made out a check for her and delivered it to the agent. The court further said that if the "agent forges or causes to be forged the endorsement of the payee, and then adds his own endorsement and, directly or indirectly, secures payment of the check or draft by the bank upon which it is drawn, can it be held that payment is a valid charge against the account of the drawer? In the absence of any evidence of fraud or negligence upon the part of the maker of the check it cannot be. A bank's contract with its depositors is to pay only upon genuine endorsements." See also Second National Bank of Pittsburgh

v. Guarantee Trust & Safe Deposit Co. of Shamokin, 206 Pa. 616.

Appellant's second position is that the circumstances attending the issuance of the drafts, their endorsement, acceptance and presentment for payment, were such as to relieve the defendant from responsibility in relation to the genuineness or authenticity of the endorsement. This might be so if the defendant could ignore the rule of law which fixes its and not the plaintiff's responsibility for the genuineness of the endorser's signature. It is urged that, because all the drafts were presented to the plaintiff for acceptance, and accepted by it, after the endorsements, that thereby the defendant bank is relieved. The drafts themselves expressly provided that they were payable by the defendant bank "upon acceptance by the National Union Fire Insurance Company." The former could not lawfully pay them and charge them to the plaintiff's account until they were accepted by it. The very purpose of the rule as to nonliability of an acceptor for the genuineness of endorsements is to protect it against just such liability as has here been brought about by the fraudulent endorsement. Drafts drawn on distant cities and endorsed by the payee where drawn must of necessity go to the acceptor without responsibility for the validity of the endorsement. He cannot be expected to follow the endorsements back to ascertain their genuineness. His acceptance implies only that he will pay to the holder or endorsee out of funds in his hands. If he does not pay on demand, and suit is brought by the holder against him, the holder must establish the genuineness of all prior endorsements. It is a circumstance in this case, not in any way affecting the broad legal principle which rules it, that the endorsements on the drafts, both before they came to the defendant and the plaintiff, were guaranteed by other banks through which the drafts had passed. To these banks the defendant can look to make itself whole.

It is also urged that the words on the back of the drafts "Instructions relative to endorsement of draft" which

read "Endorsement of this draft should be made by the payee or payees, as described in its face; if made by an attorney or agent or the representative of an estate, properly certified evidence of authority must accompany the draft unless previously filed with this company at its office in Pittsburgh, Pa.," amounted to a prescribing, by the plaintiff, of what should be a good endorsement, and what should be evidence thereof, and that the intent of this is, that the plaintiff undertook to pass on the validity of the endorsement of the payee. The words can be construed into no such meaning. They are but instructions by the drawer of the draft as to how the draft must be endorsed. As we all know, this is a most usual business precaution intended to facilitate the payment of drafts and checks by prescribing that endorsements must be in the identical way written in the body of the instrument.

Appellant argues that a distinction should be made between the acts of Carty in forging the proofs of loss and the signature of the payee endorsed on the drafts, and his acts in checking the records of James & Company and the insurance company to see if they corresponded. It is acknowledged that the former acts were outside of his line of duty, and that his knowledge of them was not the knowledge of his employer, but, it is claimed, the latter acts were within the scope of his duty, and his knowledge of them should be imputed to his employer. Stated in another way, the argument is that, where the forgery has been committed by a dishonest agent, the knowledge cannot be imputed to his principal because committed without the scope of his employment, but if the said agent is thereafter employed within the scope of his employment in the performance of acts which would have disclosed the forgery, then he is in the same position as an honest employee, and his acts and knowledge are imputed to the principal. Myers v. Southwestern National Bank, 193 Pa. 1, and other cases are cited in support of this position. In the Myers Case,

a clerk of the plaintiff, committed forgeries of checks. To this clerk was committed the duty of comparing the monthly bank statements with the cancelled checks. No examination of the statements was made by the plaintiff himself. The court held that it was a duty which plaintiff owed to the bank to examine promptly the statements and vouchers, and that if he delegated such duty to another, he was bound by the act of his agent. Other cases cited were to the same effect. The present case, however, is essentially different; there is no complaint of a failure to verify statements and vouchers. The complaint is that there was no proper examination made of the records of the general agent and the insurance company to ascertain if they corresponded; but such an examination, even if made by an honest employee would not have revealed the forgeries, and Carty's duty in the matter was as much within the scope of his employment as the preparation of the proofs of loss and the drafts to pay the losses.

In United Security Life Ins. & Trust Co. v. Central National Bank of Phila., 185 Pa. 586, forgeries of checks were committed by one Williams, the settlement officer of the plaintiff, who had charge of the settlement books and made the entries relating to the forged checks. It did not appear that Williams had anything to do with verifying the bank statements with returned checks. The court held that the knowledge and acts of Williams could not be imputed to his employer. Mr. Justice MITCHELL, after referring to the general rule that knowledge of the agent in the course of his employment is notice to the principal, said: "The rule......is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so; but no agent who is acting in his own antagonistic interest, or has committed a fraud by which his principal is affected, can be presumed to have disclosed such fraud. It would be contrary to all experience of human nature,

on which presumptions are founded," citing Gunster v. Scranton Power Co., 181 Pa. 327.

Appellant further urges that the drafts were not negotiable instruments. They are somewhat different in form from ordinary drafts, but not in any essential matter. They were addressed to the insurance company, signed by James & Company, the general agents, and stated that "Upon acceptance by the National Union Fire Insurance Company, the Mellon National Bank, Pittsburgh, Pa., will pay to the order of" the policy-holder named therein. When the drafts were accepted by the insurance company, they became valid negotiable instruments. The fact that they were not addressed directly to the Mellon Bank is immaterial. Nor is it material that the party to do the paying was not the party whose acceptance was required. Precisely similar drafts were sustained as negotiable instruments in General Fire Assurance Co. v. State Bank, 177 N. Y. App. 745. Furthermore, the Act of April 5, 1849, P. L. 427, 3 Stewart's Purdon, 3252, provides: "All bills of exchange, drafts, orders......or other instruments in the form, nature or similitude thereof......shall be held to be negotiable by endorsement and recoverable by the endorsee......in the same manner, to all intents and purposes, as bills of exchange and promissory notes formally drawn and ordinarily in use and negotiable within this Commonwealth, are now by law recoverable therein."

Appellant sets up that the fact that plaintiff brought suit against James & Company to recover the amount of the forged drafts and thereafter there was a settlement and withdrawal of this suit and a payment by James & Company to plaintiff of one-half of the amount of the drafts and a purchase by them of a one-half interest in the claim and that the present suit is being prosecuted against the defendant for their joint account created such an invidious situation as prevented recovery. We cannot adopt this conclusion. There has

been nothing shown to debar plaintiff from selling an interest in the claim or suing to recover it.

As to the alleged negligence of James & Company in connection with issuing the drafts and not sooner detecting Carty's wrongdoing, it is sufficient to say an examination of the testimony does not indicate there was any negligence on their part in conducting their business as far as it related to the duties of Carty.

The other questions raised by appellant are minor and could not affect the recovery. It may be appropriate to reiterate, in closing this opinion, what was said in McNeely Co. v. Bank of North America, 221 Pa. 588, 593: "The relation between a bank and its depositor is a contractual one. Its understanding with its depositor is to pay his checks, if he has sufficient funds with it for that purpose, and it assumes all the risk as against him of a mispayment in paying and charging to his account a check which he has not signed or one which he has signed bearing a forged indorsement of the payee. To his account it may not charge such a check. If it does, the depositor can recover from it the amount so charged. No payment by a bank on a forged signature of a depositor as drawer of a check, or on a forged endorsement of his payee, can affect him. His right is to get back from the bank whatever he has deposited with it, less what has been properly paid out on his orders. The responsibility of the bank to the depositor is absolute, and it can retain no money deposited with it by him to reimburse it for any mispayment it has made out of such deposit."

The assignments of error are all overruled and the judgment is affirmed.